**Lydia SPARROW, Plaintiff,**

v.

**PIEDMONT HEALTH SYSTEMS AGENCY, INC., Defendant.**

**No. C–82–410–WS.**

United States District Court,
M.D. North Carolina,
Winston-Salem Division.

Sept. 18, 1984.

---

John W. Gresham, of Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, of Charlotte, N.C., for plaintiff.

J. Samuel Johnson, Jr., of Dees, Johnson, Tart, Giles & Tedder, Greensboro, N.C., for defendant.

## MEMORANDUM OPINION

GORDON, Senior District Judge.

### I. *Introduction*

Plaintiff, Lydia S. Sparrow, filed this action against Piedmont Health Systems Agency, Inc., on April 15, 1982. Plaintiff alleged that defendant had violated Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e *et seq.*) by discriminating against her on the basis of sex, and by retaliating against her for pursuing her rights under the Act.

A trial upon these claims was held on July 2 and 3, 1984. Having fully considered the evidence presented at trial, arguments of counsel, trial briefs, stipulations, and other matters of record, the Court concludes that the plaintiff has failed to show illegal discrimination that would entitle her to recover from the defendant. Pursuant to Fed.R.Civ.P. 52(a), the Court enters the following Findings of Fact and Conclusions of Law.

### II. *Findings of Fact*

1. Lydia S. Sparrow is a female resident of Forsyth County, North Carolina, and was employed from March 11, 1977, to April 23, 1979, as a Reviews Associate in the Project Review Department of Piedmont Health Systems Agency, Inc. ("PHSA" or "Agency").

2. PHSA is an agency authorized by the National Health Planning and Resources Development Act of 1974. 42 U.S.C. § 300k *et seq.* The Agency analyzes and reviews capital expenditures by health care providers in an eleven county area of North Carolina. During plaintiff's employment with PHSA there were between fifteen and twenty staff personnel employed by the Agency. The Agency was divided into four Departments: Planning, Communications, Review, and Resource Development. Each Department was headed by a Director, and staffed by one to three subordinates, denominated as either Planners, Assistants, or Associates (Plaintiff's Exhibit 19). In addition, the Agency also received input from various Committees composed of both lay and professional personnel. (Plaintiff's Exhibit 42).

3. At the time she was employed by the Agency, plaintiff was a Registered Nurse with approximately nineteen years of experience in different hospital settings. In addition, plaintiff had received a BS in Business Administration and had completed the course work for an MBA, but had not submitted her thesis. During her employment with the Agency, plaintiff participated in various continuing education seminars and workshops in the area of health care finance, and had begun to take the course hours required for the CPA examination. (Sparrow Testimony; Plaintiff's Exhibit 2B).

4. As Project Review Associate, plaintiff assisted in determining whether a health care provider would obtain a certificate of need for proposed capital expenditures. Plaintiff helped to prepare and review provider applications for certificates of need, developed criteria for measuring the cost effectiveness of proposed expenditures, and evaluated various financial matters associated with health care, including Medicare and Medicaid reimbursements.

5. On November 1, 1978, plaintiff attempted to resign from the Agency. This action was apparently precipitated by a personality conflict plaintiff was having with her immediate supervisor, Mimi Eller, who was Project Review Director. (Defendant's Exhibit 22, p. 22–23). In her letter of resignation, however, plaintiff stated that she was "resigning in order to attend school full time for six months and take the CPA exam in November 1979."

(Defendant's Exhibit 4). Thus, plaintiff's attempted resignation was influenced both by her desire to obtain her CPA, as well as the conflict with Ms. Eller. (Sparrow Testimony).

6. Plaintiff's resignation was not accepted by the Agency's Executive Director, Ned Clark. Instead, plaintiff and Clark agreed to a compromise whereby plaintiff would be permitted to take Tuesday and Thursday morning classes and continue to work part-time at the Agency. Plaintiff's pay was reduced to reflect this new part-time arrangement. The conflict with Ms. Eller, however, apparently continued.

7. Eller suddenly resigned on April 2, 1979. Upon hearing of her resignation, plaintiff presented Clark with an application for the position. (Plaintiff's Exhibit 2A). Mr. Clark, however, did not select plaintiff to fill the vacancy. Rather, he chose to combine the Project Review Department with the Resource Development Department, and to retain the then Director of the Resource Development Department, Richard Bennett, as Director of the combined Departments. The newly constituted Department was to be denominated the Implementation Department. (Defendant's Exhibit 23). This departmental reorganization was undertaken not only to compensate for the loss of Eller, but also as an efficiency and cost-cutting measure. (Plaintiff's Exhibits 2C, ¶ 3, 49, p. 4). The change had the effect of eliminating the salary for a Project Review Director, and raising slightly Bennett's salary, because he would now head a Department with the continued responsibility of two Departments. In addition, Clark had intended to raise plaintiff's salary by 3 per cent following the change. (Plaintiff's Exhibit 2C, ¶ 2). The reorganization, however, was accomplished without notice to the staff members of these Departments, as the testimony revealed that these staffers did not realize Bennett was in charge of both Departments until after the change had been effectuated. (Church Testimony; Harrison Testimony; *see also* Byerly Testimony).

8. Richard Bennett had been with the Agency since January 1979. At the time in question he held a BA in Business Administration and Geography, and had completed the course work for his Masters in Economic Geography. Prior to coming to PHSA, Bennett had two years experience as an Executive Associate with another regional health systems agency, and had held other positions with health planning and planning agencies in the state. (Plaintiff's Exhibit 54, Biographical Sketch). A description of the two Directorships Bennett filled at PHSA is attached as an Appendix to this Opinion. (Taken from Plaintiff's Exhibit 54, prepared by the Agency in late 1978).

9. On April 9, 1979, plaintiff was informed by Clark that Bennett was to be named Director of Project Review, in addition to his position as Resources Development Director. Plaintiff immediately tendered her resignation, effective April 23, 1979. (Plaintiff's Exhibit 57). At first, Clark attempted to dissuade plaintiff, but she refused to withdraw her resignation. In a letter to the PHSA Personnel Committee dated April 19, 1979, plaintiff stated that "I am resigning because Mr. Clark selected someone who had been with the Agency only three months and had no recent project review experience to supervise me." (Plaintiff's Exhibit 2C, ¶ 1). Later, in a May 1, 1979, letter to the same Committee, plaintiff stated:

> It was my opinion that Mr. Clark's decision to promote a younger male instead of me, especially when he had no current knowledge of Project Review procedures in general or our division in particular, was a gross professional insult—in effect a constructive discharge. Mr. Clark had placed me in a position where I had to resign or suffer a continuing professional insult. There was no way I could continue at the Agency as long as my immediate supervisor was less qualified and had the blessings of the Executive Director.

(Plaintiff's Exhibit 2D, p. 2). Plaintiff testified, however, that at the time of her resignation she had only a limited knowl-

edge of Bennett's past work experience and education.

10. Following her resignation, plaintiff requested a grievance hearing before the PHSA Personnel Committee. (Plaintiff's Exhibit 2C). At this hearing, which took place May 1, 1979, plaintiff sought to vacate Mr. Clark's decision to appoint Bennett to the position of Project Review Director. The Personnel Committee was also presented with a request by Jeanne Byerly, Chairman of the Project Review Committee, that plaintiff's resignation be delayed sixty to ninety days until pending project reviews were completed. (Plaintiff's Exhibits 59, 60). The Committee subsequently passed a resolution accepting plaintiff's resignation since it "was made voluntarily and ha[d] been accepted by the Executive Director...." (Plaintiff's Exhibit 60).

11. In February 1980, plaintiff, who had continued to take accounting courses at the University of North Carolina-Greensboro, ("UNC–G") requested that Mr. Clark, as Executive Director of the Agency, complete a recommendation for her file at the UNC–G Placement Office. Plaintiff, however, refused to waive her right of access to this recommendation, asking that it be non-confidential. (Plaintiff's Exhibit 58). Plaintiff could therefore exercise her right to review the recommendation.

12. When the recommendation was not forthcoming, plaintiff's attorney contacted defendant's attorney to determine the reason for the delay. (Plaintiff's Exhibit 46). By letter of March 14, 1980, defendant's attorney stated:

> Under the circumstances presently existing as to the type of charge that Mrs. Sparrow has made, Mr. Clark does not feel at all comfortable with making any kind of recommendation. We would want you to understand that this is in no sense a form of retaliation, since whether he makes a recommendation at all is a choice that we feel he has. He would have no problem with a recommendation were this charge not still pending, but since it is pending it is his feeling that Mrs. Sparrow may attempt to use the recommendation adversely against the Agency whether it be very favorable, favorable or not at all favorable.

(Plaintiff's Exhibit 47). This letter makes it appear that but for plaintiff's EEOC charge, she would have received a recommendation from the Agency.

13. During plaintiff's employment with the Agency, her position in the Agency hierarchy was similar to that of Gordon Church, who was a Resource Development Associate from January 1978 to January 1980. (Defendant's Exhibit 6). Church had never worked in the Project Review Department; thus, he could offer little more than the general observation that the positions were at the "same level" in the organizational chart and probably carried similar responsibilities. This observation was supported by the current Executive Director of the Agency, Gloria Haynes, who noted that while the positions of Project Review Associate and Resource Development Associate were comparable in terms of educational requirements and the complexity of the skills required for job performance, the specific tasks performed in each job were different.

14. At the time he was employed by PHSA, Church had a BA in Political Science, and three years experience in a health planning organization in Boone, North Carolina. (Plaintiff's Exhibit 54, Biographical Sketch).

15. A comparison of the annualized salaries of plaintiff and Church is tabulated below. (See Plaintiff's Exhibits 2, 6). Church's February 1979 salary reflects a bonus for the additional responsibility he carried in putting together the Agency's annual proposal. Furthermore, Church's salary for April 1979 reflects the additional duties he assumed after Bennett was given the position of Director of Implementation. (Church Testimony).

| Period | Sparrow annualized salary | Church annualized salary |
|---|---|---|
| 1–30–78 to 4–30–78 | $15,000.00 | $15,000.00 |
| 5–1–78 to 8–30–78 | $15,450.00 | $15,450.00 |
| 9–1–78 to 9–30–78 | $16,224.00 | $15,450.00 |
| 10–1–78 to 1–31–79 | $16,704.00 | $16,704.00 |
| 2–1–79 to 2–28–79 | $16,704.00 | $19,872.00 |
| 3–1–79 to 3–31–79 | $16,704.00 | $17,544.00 |
| 4–1–79 to 4–30–79 | $16,704.00* | $18,072.00 |

* Plaintiff resigned April 9, effective April 23, 1979.

16. In the Fall of 1979, Church began to attend MBA classes at Wake Forest University. These classes were scheduled weekly on alternate Fridays and Saturdays. Church had previously discussed his interest in obtaining his MBA with Clark, and both Clark and Bennett had encouraged him to attend, as they believed the Agency would benefit from Church's learning experience. Church's salary remained the same during this period even though he missed two days of work per month. In November 1979, however, the Agency reversed its position on Church's educational leave, and retroactively reduced his salary to reflect his actual working hours. This action was apparently precipitated by the EEOC factfinding hearing on plaintiff's sex discrimination charge.

17. Plaintiff was paid for vacation time that had accrued up to the effective date of her resignation, as she had requested. (Plaintiff's Exhibit 57). The Agency had no policy on severance pay at this time. Two male employees who had resigned were, however, paid for periods which extended beyond their accrued vacation times. Larry Jarvis, whose position with the Agency was not revealed, resigned effective February 3, 1978, worked until January 1, 1978, and was paid until January 31, 1978, although he had but ten days accrued vacation. (Haynes Testimony; Plaintiff's Exhibit 21). Ted Linkous, Associate Director of the Agency, resigned effective May 31, 1979, worked until May 11, 1979, and was paid through June 1979. Linkous had twenty-five days accrued vacation, but Agency policy did not allow payment for more than twenty days. (*Id.*)

18. The testimony demonstrated that Richard Bennett was unable to fulfill the duties required in the new position in which he was placed. (Harrison Testimony; Church Testimony). In May 1980, the Resource Development Division was transferred from the Implementation Division to the Planning Division; thus, Bennett was left with the Directorship of the Review Services Division. (Plaintiff's Exhibit 49, p. 5).

19. Plaintiff filed her initial charge of sex discrimination against PHSA on September 4, 1979. (Plaintiff's Exhibit 29). This charge was subsequently amended on October 6, 1979, and again on November 17, 1979. (Plaintiff's Exhibits 30, 31). The amended charge alleged that plaintiff was discriminated against on the basis of sex in the areas of promotion, pay, and failure to provide similar educational benefits.

20. Plaintiff filed an additional charge of discrimination on June 4, 1980, alleging that defendant's action in refusing to provide her with a recommendation constituted unlawful retaliation; this charge was amended on August 26, 1980. (Plaintiff's Exhibits 32, 33).

### III. *Discussion*

Plaintiff's suit raises three broad claims: (1) that she was discriminated against on the basis of sex when Clark refused to promote her to Project Review Director; (2) that the Agency's discriminatory actions caused her to be constructively discharged; and (3) that the Agency retaliated against her for exercising her rights under Title VII. Each of these claims will be addressed in turn.

### A. *Promotion Claim*

█ Plaintiff's allegation that defendant discriminated against her when it failed to promote her raises a classic "disparate treatment" claim. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Wright v. National Archives and Records Service*, 609 F.2d 702, 713 (4th Cir.1979). In a disparate treatment case, the plaintiff bears the ultimate burden of proving that the defendant employer intentionally discriminated against her. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

█ The method of analysis in disparate treatment cases is well established. Plaintiff has the initial burden of establishing,

by a preponderance of the evidence, a *prima facie* case of sex discrimination. A *prima facie* case may be established by showing (i) that the plaintiff applied and was qualified for a job for which her employer was seeking applicants; (ii) that despite her qualifications, she was rejected; and (iii) that after her rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).[1] If such actions are proven, then the inference arises that more likely than not, such actions were "based on a discriminatory criterion illegal under the Act." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (*quoting International Brotherhood of Teamsters*, 431 U.S. at 358, 97 S.Ct. at 1866).

■ If the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to dispel this adverse inference by articulating, through the introduction of admissible evidence, a legitimate nondiscriminatory reason for its actions. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094; *Board of Trustees v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). If the employer meets this burden of production, the plaintiff will suffer a dismissal unless she can prove that the defendant's proffered reasons are actually pretexts for intentional discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

■ A review of the evidence convinces this Court that plaintiff has established a *prima facie* case. Though defendant stressed that plaintiff had insufficient supervisory experience in the health planning area, a review of the "position description" for the position suggests that while supervisory skills were important, the primary qualifications for the position focused upon the technical aspects of the job. (*See* Appendix). The uncontradicted evidence demonstrated plaintiff's proficiency in the skills required for the position, which included financial analysis, development and review of project proposals, and plaintiff's familiarity with the project review process itself and with the laws under which the Agency operated. While it is difficult for a court to determine wholly from documentary and testimonial evidence that an employee is qualified for a particular job, the Court is confident that plaintiff was qualified to serve as Project Review Director as that position existed on April 1, 1979.

Having proven a *prima facie* case, the burden of production then shifted to the Agency to articulate a legitimate, nondiscriminatory reason for its failure to promote plaintiff. Defendant met this burden by offering evidence that the position for which plaintiff applied no longer existed after April 9, 1979, since it had been combined with the Directorship of the Resource Development Department. Defendant argues that plaintiff was not qualified to hold *both* Directorships, and that in any event, it was entirely reasonable to have Bennett, who was already a Director of one of these Departments, simply to assume the duties of another Directorship.

Plaintiff responded that defendant's proffered reasons for its failure to promote her are pretextual, and that the decision was based upon the unlawful criterion of sex. Plaintiff claimed that the combination of the Project Review Department and the Resource Development Department occurred only after illegal discrimination had occurred, in an attempt to justify the failure to promote plaintiff to a position for which she had applied, but for which Bennett had not. In her effort to prove pretext, plaintiff offered evidence from which, it is argued, sex discrimination can be in-

---

**1.** Factual settings necessarily vary in Title VI cases, and the *prima facie* elements set forth in *McDonnell Douglas* are not necessarily applicable in every setting. *McDonnell Douglas, supra* at 802 n. 13, 93 S.Ct. at 1824 n. 13. In this action, however, it is clear that the *McDonnell Douglas* formula is an appropriate framework in which to analyze plaintiff's promotion claim. *Burdine, supra* 450 U.S. at 252–53, 101 S.Ct. at 1093.

ferred. The evidence offered is alleged to show discriminatory salary differentials, unequal educational benefits, and unequal "severance pay".

Thus, the dispositive issue in this case is whether plaintiff has carried her burden of proving that defendant's articulated reasons were pretextual, and its actions were more likely than not the result of intentional sexual discrimination. A thorough review of the evidence convinces the Court that plaintiff has failed to carry her burden of showing that this evidence demonstrates a "substantial" or "reasonable probability" that defendant's explanation is pretextual. *Fink v. Western Electric Co.*, 708 F.2d 909, 916 (4th Cir.1983).

Plaintiff's promotion claim centered around the theory that the Agency reorganization which gave birth to the "Implementation Department" was undertaken after the fact, in an effort to justify Bennett's assumption of both Directorships. Plaintiff pointed to various facts to justify this theory: (1) the position was not listed in the Grant Application for May 1979 to April 1980 (Plaintiff's Exhibit 54); (2) Bennett never formally applied for the position; (3) the Implementation Department was short-lived, with Resource Development being moved to the Planning Department in 1980 (Plaintiff's Exhibit 49, p. 5); (4) the staff members of the combined departments have only the vaguest recollection of the reorganization; and (5) the reorganization was not necessary to save money, since the Agency had a budget surplus for all years relevant to this litigation.

The Court finds this evidence unpersuasive. It confirms the Court's impression that after Eller's resignation, the Agency continued to function as it had before, except for the absence of one Director. While this evidence might show pretext, it can be interpreted to show an Agency going through the disorganization often associated with a relatively new and evolving venture. The year in which these events took place was the third year of the Agency's existence; during this early period, its internal organization was subject to vari-

ous changes. (*Compare* Plaintiff's Exhibits 25, 63 and 49). The grant application, prepared in advance of the Agency's fiscal year, did not always reflect these changes. (Harrison Testimony).

At best, the evidence demonstrated that Bennett proved to be unqualified to hold the combined Directorship *after* the reorganization was complete. This subsequent realization, however, cannot be used in this case to support a theory of sex discrimination at the time of his original selection. At that time, Bennett was at least as qualified as plaintiff for the job of Project Review Director. He had recent health planning experience, and was already serving as a Director of one Department within the Agency. This current, relevant, and specific background helps to dispel any inference that his selection was motivated by the illegal criterion of sex. *See, e.g., Anderson v. Bessemer City*, 717 F.2d 149, 153–54 (4th Cir.1983). In contrast, the majority of plaintiff's experience was in nursing, although she had recently developed skills in the health planning and finance areas. The Agency "ha[d] discretion to choose among [these] equally qualified candidates, provided the decision [was] not based on unlawful criteria." *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096.

Most importantly, plaintiff had previously sought to resign in November 1978, expressing her interest in the accounting field. While accounting is not unrelated to the position for which she applied, Executive Director Clark could reasonably have believed that plaintiff was primarily interested in obtaining her CPA, and would be unlikely to remain with the Agency after she received her certification. These legitimate, nondiscriminatory reasons offered by the Agency for the selection of Bennett have not been shown to be "unworthy of credence". *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

 Turning next to the alleged wage disparity, the facts of this case do not support plaintiff's claim. Certainly, a plaintiff can establish sex-based wage discrimination without having to show that

the jobs involve "equal work". *Washington v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). When plaintiff offers evidence of wage differentials between jobs that are only "similar", however, she must show that the differential is more than *de minimus* for the Court to infer sex discrimination. *See, e.g., Plemer v. Parsons-Gilbane,* 713 F.2d 1127, 1133 (5th Cir.1983) (*Gunther* limited to "blatant cases of sex discrimination"). Such a limitation is necessary if the Court is to avoid the dangers inherent in a subjective evaluation of the "value" or "worth" of jobs with differing duties and responsibilities. *Id.* at 1134, *see also Gunther,* 452 U.S. at 181, 101 S.Ct. at 2253.

■ Plaintiff's claim of discriminatory payment of wages was based primarily upon a comparison of her job and salary with the job and salary of Gordon Church, who was then a Resource Development Associate. The Court is satisfied that these jobs were sufficiently related to satisfy the "similarity" requirement of *Gunther.*[2] The evidence fails, however, to show that the wage differentials were so substantial as to create an inference of discrimination. A comparison of the annualized salaries of plaintiff and Church reveals that while both were with the Agency, there were two months (February and March 1979) when Church's salary exceeded plaintiff's, while there was one month (September 1978) when plaintiff's salary exceeded Church's. (Finding of Fact 15). The uncontradicted testimony demonstrated that Church's February wage was due to a bonus for additional duties he performed. Though his March wage shows an unexplained 5 per cent increase over plaintiff's salary, this differential is not legally significant for jobs that could only be described as "similar". Indeed, plaintiff was the beneficiary of a similar differential in September 1978. The reason for this disparity in her favor also went unexplained.

■ Turning to the alleged discriminatory allocation of educational benefits, plaintiff again points to differences between the benefits given to Church and those benefits that she received. Plaintiff's pay was adjusted to reflect time she spent in accounting classes, while Church's pay was adjusted only after plaintiff's EEOC fact finding hearing. On its face, such treatment appears unjustified. Placed in the proper context, however, such actions were entirely justifiable, and evidenced no discriminatory intent.

Plaintiff attempted to resign her job at the Agency in November 1978. Her resignation was not accepted, however, and plaintiff and Executive Director Clark reached an agreement that allowed plaintiff to work part-time while she attended CPA classes. This sequence of events places plaintiff in a wholly different position from Church, who as a full time employee, was given educational "leave time" for courses that benefited the Agency. Plaintiff cannot now reinterpret as discriminatory a compromise that offered a partial solution to the personality conflict with Eller, as well as an opportunity to obtain her CPA course hours.[3]

■ Finally, plaintiff claims that defendant paid two males "severance pay" when they resigned, while she received none following her resignation. Though characterization of these payments as "severance pay" is inaccurate, the evidence indicated

---

**2.** Plaintiff also attempted to show wage disparities between Haynes and McMillian, Bennett and Haynes, and Eller and McMillian. Yet there was little or no evidence offered to show the similarity of jobs held by these people, other than the indication that they all held Directorships at the same level in the PHSA organizational chart. (Plaintiff's Exhibit 19). This evidence was therefore of no probative value on the issue of defendant's alleged intentional discrimination. *Stastny v. Southern Bell Telephone*

*and Telegraph Co.,* 628 F.2d 267, 281 (4th Cir. 1980).

**3.** Furthermore, the Court is reluctant to permit plaintiff to challenge as discriminatory any acts that took place some months after plaintiff's resignation. Though in some circumstances such subsequent acts might be probative of defendant's intent to discriminate against plaintiff, the Court finds this evidence of little probative value in this case.

that these two males, Jarvis and Linkous, were paid for periods beyond their accrued vacation time. (Finding of Fact 17). The Court cannot, however, infer discrimination on such minimal facts. Plaintiff offered no evidence of the circumstances surrounding these resignations so that the Court could make a reasoned evaluation why these discrepancies occurred. Plaintiff was required to meet her burden of proof on this issue by offering more than summary oral testimony.[4]

In sum, none of these factors, taken individually or as a whole, gave this Court sufficient evidence upon which it could reasonably determine that plaintiff was discriminated against on the basis of sex. This Court cannot "infer [discrimination] from evidence that does no more than suggest it as a possibility." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 245 (4th Cir. 1982). Thus, this claim must be dismissed.

## B. *Constructive Discharge Claim*

 Plaintiff's next claim is that defendant's actions caused her to be constructively discharged. In this Circuit, to establish a constructive discharge, " 'the employee must [have been] subjected to employment practices which are discriminatory and which make the working conditions intolerable, thus forcing the employee to quit. Further, the employer's actions must be intended by the employer as an effort to force the employee to quit.' " *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 672 (4th Cir.1983), *rev'd on other grounds sub nom. Cooper v. EEOC*, —— U.S. ——, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984), quoting *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir.1982); *see also Johnson v. Bunny Bread Co.*, 646

F.2d 1250, 1256 (8th Cir.1981); *Velasquez v. Colorado Springs*, 23 F.E.P. 621 (D.Colo.1980); *Hamoud v. Bell Telephone*, 22 F.E.P. 1543 (E.D.Pa.1978).[5] The cases require that the discrimination suffered by the employee be particularly severe—an aggravated condition—for a finding of constructive discharge. *See, e.g., Clark v. Marsh*, 665 F.2d 1168 (D.C.Cir.1981) (continuing pattern of discrimination over period of years). Thus, neither the failure to promote, the payment of unequal wages, nor an unlawful transfer, each by itself, provides the factual basis for a finding of constructive discharge. *Grigsby v. North Mississippi Medical Center, Inc.*, 586 F.2d 457 (5th Cir.1978) (failure to promote); *Heagney v. University of Washington*, 642 F.2d 1157, 1166 (9th Cir.1981) (unequal pay); *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65–66 (5th Cir. 1978) (unequal pay); *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir.1977) (unlawful transfer).

 Plaintiff's evidence fails to support a theory of constructive discharge. She has not shown that defendant's "discriminatory" acts made her working conditions "intolerable," nor can she show the Agency "force[d... her] to quit." As discussed previously, plaintiff's evidence is insufficient to permit this Court to draw the inference that the Agency intended to discriminate against her; this same evidence would, *a fortiori*, fail to support a claim of constructive discharge. Plaintiff's statements at the time of her resignation reveal that her action was prompted not by discriminatory conduct, but by her perception that she had suffered "a gross professional insult" as a result of Bennett's promotion. (Plaintiff's Exhibit 2D).[6] Title VII does

---

4. In addition, Jarvis resigned after plaintiff had left the Agency. *See* footnote 3, *supra*.

5. Another line of cases holds that while the discriminatory working conditions must be intolerable, proof of employer intent to cause the employee to resign is not required. *See, e.g., Downey v. Southern Natural Gas Co.*, 649 F.2d 302 (5th Cir.1981); *Clark v. Marsh*, 665 F.2d 1168 (D.C.Cir.1981); *Heagney v. University of Washington*, 642 F.2d 1157 (9th Cir.1981).

6. Plaintiff's deposition, taken in May 1983, confirms that discriminatory conduct by the Agency had little to do with her resignation:

Q: When was it that you first became concerned that Gordon Church was paid more in his position than you were?
A: Soon after he came here.

. . . . .

Q: Did that have anything to do with your resignation on April 9?
A: No.

not, however, provide a remedy for such disappointed expectations unless they are caused by employer decisions based on unlawful criteria.

Furthermore, rather than seeking "to force [the plaintiff] to quit", the Agency desired that plaintiff remain at her job. Both after her attempted resignation in November 1978, and again in April 1979, the Executive Director sought to persuade plaintiff not to resign. These actions are wholly inconsistent with plaintiff's claim of constructive discharge. Therefore, this claim must also be dismissed. *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d at 672–73.

### C. *Retaliation Claim*

Finally, the Court comes to plaintiff's claim that the Agency retaliated against her by refusing to complete a requested recommendation. This recommendation was to be placed on file at the UNC–G Placement Office. (Findings of Fact 11–12).

Under 42 U.S.C. § 2000e–3(a), it is "an unlawful employment practice for an employer to discriminate against any ... individual ... because [she] has made a charge under" Title VII. A flexible scheme of proof similar to that contemplated by *McDonnell Douglas* and *Burdine* applies to claims of unlawful retaliation. *Burris v. United Telephone Co.*, 683 F.2d 339, 343 (10th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982); *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325, 1327–28 (5th Cir. 1980); *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981); *Cf. Smith v. Secretary of Navy*, 659 F.2d 1113, 1120 (D.C.Cir.1981) (*McDonnell*

*Douglas* scheme of proof inapplicable under facts of that case).

 To prove retaliation, a claimant must establish a *prima facie* case by showing that (1) the claimant engaged in a statutorily protected activity, (2) an adverse employment action occurred, and (3) there was a causal connection between the protected activity and the adverse action; in other words, that retaliatory motive played a part in the employers action. *Payne v. McLemore's Wholesale and Retail Stores*, 654 F.2d 1130, 1136 (5th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2nd Cir.1980). As in the *McDonnell Douglas/Burdine* paradigm, motive may be shown through evidence of circumstances that would justify an inference of retaliation.

 Plaintiff's action in filing her initial EEOC charge was an activity protected under Title VII. In addition, there can be little doubt that the lack of a customary recommendation from a former employer severely disadvantages a person seeking employment, by restricting employment opportunities that might otherwise be available. Finally, defendant unequivocally based its decision not to provide a recommendation upon plaintiff's pending EEOC charge. Plaintiff has thus shown a *prima facie* case of retaliation.

 Defendant attempted to justify its actions by claiming that plaintiff's failure to waive her right of review, coupled with the probability of future litigation in this matter, placed it in the unenviable position of creating evidence damaging to its defense of the discrimination charge. The Court sympathizes with this argument. Nevertheless, Title VII prohibits not only

Q: Nothing whatsoever.
A: No ... I didn't resign because there were salary differences. I brought a complaint that there were salary differences.
Q: Well, after you resigned and had left, is that right?
A: Yes.
Q: Then it had nothing to do with your leaving the agency?

A: Right.
Q: When was it that you first became concerned that you had received no severance pay?
A: I don't remember.

. . . . .

Q: Did that have anything to do with your resignation?
A: No.
Defendant's Exhibit 22, pp. 73–74.

discrimination based upon a factor such as sex, but also discrimination based upon the exercise of statutory rights. Thus, an employer violates the Act by refusing to provide a recommendation solely because a past employee has filed an EEOC charge.[7] *Pantchenko v. C.B. Dolge Co.,* 581 F.2d 1052, 1055 (2nd Cir.1978) (allegation that refusal to provide reference was in retaliation for filing EEOC charge sufficient to avoid summary judgment); *Digest of EEOC Decision,* EEOC Dec. 74–15, 6 F.E.P. 1011, 1012 (1973). Similar results have been reached when unfavorable recommendations have been given in retaliation for exercising a protected right. *See, e.g., Smith v. Secretary of Navy,* 659 F.2d 1113, 1121 (D.C.Cir.1981); *London v. Coopers & Lybrand,* 644 F.2d 811, 817–18 (9th Cir.1981); *Shehadeh v. Chesapeake & Potomac Telephone Co.,* 595 F.2d 711, 722–23 (D.C.Cir.1978); *Czarnowski v. DeSoto, Inc.,* 518 F.Supp. 1252, 1258 (N.D.Ill.1981); *see also Rutherford v. American Bank of Commerce,* 565 F.2d 1162 (10th Cir.1977) (prospective employer informed of applicant's EEOC charge). It follows that the Agency's refusal to give plaintiff a recommendation was a violation of Section 2000e–3(a).

■ Having found that plaintiff suffered an illegal act of discrimination, the Court must determine whether plaintiff has shown that she is entitled to any relief. The mere showing of a statutory violation does not necessarily entitle a claimant to a statutory remedy, for the two inquiries are "conceptually distinct." *Smith v. Secretary of Navy,* 659 F.2d at 1120.

■ Plaintiff failed to demonstrate any harm due to the failure of the Agency to provide a recommendation. There was no evidence that plaintiff's failure to obtain full-time employment following her resig-nation was caused by the absence of a letter of reference from the Agency. *Cf. Rutherford v. American Bank of Commerce,* 565 F.2d at 1164 (plaintiff's potential for employment was ruined when former employer informed prospective employer of plaintiff's EEOC charge). Plaintiff did not offer evidence that prospective employers required references, that they considered her application incomplete without a reference, or that the Agency's actions contributed to her continued unemployment. To the contrary, plaintiff testified that it was she who voluntarily informed at least one potential employer (Hanes Corporation) that she was unable to receive a recommendation from the Agency due to her EEOC action.

Plaintiff has now received a recommendation from the Agency;[8] this obviates the need for remedial action correcting the absence of this item from her file. Since plaintiff has suffered no financial loss directly attributable to defendant's failure to provide a recommendation, and has since received the recommendation, there is no basis upon which this Court might provide a remedy for defendant's acknowledged Title VII violation. *Cf. Smith v. Secretary of Navy,* 659 F.2d at 1122 (where plaintiff showed no financial harm due to false and adverse recommendation, he can be restored to position he would have had "but for" discrimination by destruction of recommendation). Therefore, plaintiff's retaliation claim must be dismissed.

IV. *Conclusions of Law*

1. The Court has jurisdiction of this action pursuant to 42 U.S.C. § 2000e–5(f)(3).

2. Piedmont Health Systems Agency, Inc. is an employer within the meaning of 42 U.S.C. 2000e(b).

---

**7.** Compliance with the Act requires that the employer give accurate recommendations and references on former employees, regardless of the pendency of an EEOC charge. An accurate recommendation will preclude liability for retaliation under Title VII, as well as under other theories, such as defamation or tortious interference with business relationships. *Shehadeh*

*v. Chesapeake & Potomac Telephone Co.,* 595 F.2d 711, 723 n. 60 (D.C.Cir.1978).

**8.** Plaintiff received a letter of recommendation from Ms. Haynes after the latter became Executive Director of the Agency. (Sparrow Testimony).

3. Piedmont Health Systems Agency, Inc. did not violate Title VII of the Civil Rights Act of 1964, as amended, by failing to promote Lydia S. Sparrow to the position of Project Review Director.

4. Piedmont Health Systems Agency, Inc. violated Title VII of the Civil Rights Act of 1964, as amended, by refusing to give Lydia S. Sparrow a recommendation in retaliation for filing an EEOC Charge. Ms. Sparrow has not, however, shown that she is entitled to relief.

The Court will enter an Order simultaneously herewith disposing of this action in accordance with this Memorandum Opinion.

## APPENDIX

## POSITION DESCRIPTION

## DIRECTOR OF RESOURCE DEVELOPMENT

### GENERAL DUTIES AND RESPONSIBILITIES

The Director of Resource Development is the staff member who is primarily responsible for Agency plan implementation and health system development. The Director of Resource Development assists in the planning and development of new, expanded, or modified health resources within HSA II in accordance with the PHSA's adopted plans. This staff member assumes responsibility for three broad functions of the Agency.

1. Staff support to the Plan Steering Committee for the development of the Annual Implementation Plan.
2. Technical assistance and consultation to area providers, community organizations, etc. to further plan implementation.
3. Administration of a grants management system when the Area Health Services Development Fund is available.

The Director of Resource Development supervises other Resource Development Division staff. This senior position is supervised by the Associate Director. Periodic evaluation of the employee's work is based on performance of the following specific duties.

### SPECIFIC DUTIES

*Plan Development*

- Provides staff support to the Plan Steering Committee and its task forces in developing and revising the annual plan.
- Designs overall process for evaluation and revision of the annual plan.
- Assumes major responsibility with the Communication Director to obtain public input regarding priorities for the annual plan.
- Devises format and insures conformance of plan to DHEW guidelines.
- Develops draft sections and supervises others in drafting sections of the annual plan.
- Works with community groups to obtain input for the priorities of the Annual Plan.
- Obtains commitment from providers and community groups to implement the annual plan.

*Plan Implementation*

- Provides staff support to the Implementation Committee.
- Develops policies and procedures governing provision of technical assistance.
- Works with provider groups and community organizations to develop or modify services as called for in the annual plan. Provides the following types of technical assistance:

 a. assists groups to identify needs and design projects;

 b. provides funding information and interpretation of regulations and guidelines.

 c. advises agencies in the drafting of proposals to funding sources;

 d. evaluates, with the Associate Director and Executive Director, the process and outcome of technical assistance and consultation.

*Administration of Area Health Services Development Funds, When Available*

- Interprets laws, regulations, and guidelines and prepares procedures affecting acquisition, allocation, and administration of Area Health Services Development Fund (when available).

a. Develops policies and procedures governing solicitation of provider applications for Area HSD fund support, and provision of assistance to potential applicants.

b. Informs and assists health care providers in preparation of applications for Area HSD Fund assistance, in conformance with established policies and procedures.

c. Defines specific information required for review of applications and monitoring of grantee projects, and designs forms for acquisition of such information.

## OTHER RESPONSIBILITIES

- Drafts plan implementation/health systems development section of the work program.
- Represents the division at Agency staff and committee meetings, at HSA and SHCC meetings, and to the public, in general.
- Works with other PHSA division heads to further the overall purpose of the agency.
- Performs other duties as assigned by the Associate Director or the Executive Director.

## REQUISITE SKILLS

- Administrative and management skills
- Supervision/leadership
- Consultation
- Group process
- Community organization
- Political acumen
- Project design and evaluation
- Written and oral communication

## EXPERIENCE AND QUALIFICATIONS

This position requires a master's degree in public health, health systems, business administration, or health planning with at least two years' experience *or* a college degree in the above mentioned fields or a related field and four years' experience.

Professional experience should include:

- Experience in the planning, evaluation, administration, or operation of a wide range of health care delivery programs, or in the solicitation and technical review and selection of innovative health care delivery proposals.
- Experience in administrative analysis and procedure design.
- Responsibility, in an organized setting, for representing an agency in the health services field in external relationships with other organizations and community groups.

## POSITION DESCRIPTION

### Reviews Director

### GENERAL DUTIES AND RESPONSIBILITIES

This is a senior professional position under the general supervision of the Executive Director, with responsibility for the regulatory, control and monitoring aspects of plan implementation in a Health Systems Agency.

The Reviews Director has principal responsibility to assess proposed or existing projects or health services in the context of the health plans and relevant criteria and standards adopted by the Agency, and to present findings for recommendation or determination by a review committee and the governing board. Important elements of the position include the development of coordinated programs for review with the State Health Planning and Development Agency and other agencies bearing review responsibilities for the same projects or services, development and implementation of forms and procedures for the administration of review processes, communication and assistance to health care provider agencies regarding review requirements and proceedings, conduct of public hearings, and participation in appellate actions.

## SPECIFIC DUTIES

- Develop coordinative working agreements on review functions, procedures, schedules and documents with the State Health Planning and Development Agency and other related agencies.
- Design work flows for the conduct of review and notification activities; define specific data needs for review of various types of project proposals under established criteria, and design forms and procedures for acquisition of such data.
- Analyze (alone or with other staff members) proposed or existing health services to determine their conformance with plans, standards, and criteria developed by the Agency and federal and state agencies.
- Develop for Agency consideration standards and criteria upon which Agency reviews might be based.
- Interpret and apply laws, regulations and guidelines affecting review processes.
- Inform and assist health care providers in complying with review requirements.
- Develop policies and procedures governing the submission of, and action on, requests for public hearings in the course of a review or following decision; serve as staff to the review committee in the conduct of such hearings.
- Organize and present information on the results of staff analyses to facilitate review committee and governing body findings and decision, on completion of each review.

## COMPETENCIES, SKILLS, AND ATTRIBUTES QUALIFICATIONS

- Thorough knowledge of the major components of the U.S. health system and their interrelationships and of the management and operation of institutional health services.
- Thorough professional knowledge of administrative system design, including techniques of work flow analysis, scheduling, form design and administrative procedures.
- Skill in individual and group communications.
- Ability to interpret and apply legal requirements and health plans and criteria in the review and analysis of health projects and services.
- Ability to exercise sound judgment in complex political-social environments and situations.
- Professional maturity and tact.
- Firm objectivity and integrity.

## QUALIFICATIONS

A Master's degree in hospital administration, business, health planning or other health/health related field is preferred. Experience may be substituted for a M.S. degree. The experience should include the following:

- professional experience in the planning, evaluation, administration or operation of a wide range of institutional health services
- professional experience in administrative analysis and procedure design
- responsibility, in an organized setting, for representing an agency in the human services field in external relationships with other organizations and community groups.