**Elaine K. BEARD, et al., Plaintiffs,**

v.

**WHITLEY COUNTY REMC, Defendant.**

Civ. No. F 86–102.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

March 19, 1987.

David B. Keller, Baker & Daniels & Shoaff, Ernest M. Beal, Jr., Parrish, Knight & Beal, Fort Wayne, Ind., for plaintiffs.

Wayne O. Adams, III & David J. Carr, Bingham, Summers, Welsh & Spilman, Indianapolis, Ind., John S. Bloom, Bloom, Bloom & Fleck, Columbia City, Ind., Leonard E. Eilbacher, Hunt, Suedhoff, Borror & Eilbacher, Fort Wayne, Ind., for defendant.

## ORDER

WILLIAM C. LEE, District Judge.

This is a discrimination case brought under § 703(a)(1) and (2) of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2(a)(1), (2) (1982). The plaintiffs are female em-

ployees of the Whitley County REMC (defendant). The plaintiffs allege that the defendant discriminated against them because of their sex and they assert claims based both on disparate treatment and disparate impact. Defendant has filed a motion for summary judgment attacking both theories of recovery. The motion is fully briefed. Oral arguments were heard on February 11, 1987. For the following reasons, defendant's motion for summary judgment is granted.

## I.

### Summary Judgment Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, ⸺ U.S. ⸺, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, ⸺ U.S. ⸺, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *Valentine v. Joliet Tp. High School Dist. No. 204*, 802 F.2d 981, 986 (7th Cir.1986).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact. *Celotex*, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 106 S.Ct. at 2511.

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 106 S.Ct. at 2512.

When intentional discrimination is at issue, as it is in the disparate treatment portion of this case, this court approaches the application of these principles with special caution. *Powers v. Dole*, 782 F.2d 689, 694 (7th Cir.1986). Summary judgment is infrequently an appropriate resolution. *McKenzie v. Sawyer*, 684 F.2d 62, 67 (D.C. Cir.1982). The factual issues in discrimination cases, including the issues of discriminatory intent which are often proven by circumstantial evidence, cannot often be resolved on summary judgment. *Powers*, 782 F.2d at 694. However, even when such issues as motive or intent are at stake, summary judgment is proper "where the plaintiff presents no indications of motive

and intent supportive of his position." *Id.;* *Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985). Accepting the plaintiffs' evidence and drawing all legitimate inferences in their favor, the court now turns to the facts.

## II.

*Factual Background*

### A.

*The Parties*

The plaintiffs are office and clerical employees of the defendant. The plaintiffs have "clerical and secretarial-related duties." The defendant has two other occupational groups: trades and crafts employees and salaried employees. The trades and craft employees generally perform outside jobs and include groundmen and linemen. The salaried employees include management and supervisory employees and employees with high levels of responsibility.

While the office and clerical jobs have been held predominantly by females, the trades and craft jobs have been held predominantly by males. However, plaintiff Diane Gawthrop was in the trades and crafts group until July 20, 1984, when she transferred to the office and clerical group. Gawthrop voluntarily transferred so that she could be on the day shift. (Deposition of Gawthrop, pp. 6, 30). Besides Gawthrop, Lana Mayleat, LuAnne Ziegler, and Terry Blair Skinner worked in the trades and crafts group. (Deposition of Beard, pp. 39–40; Deposition of Puckett, p. 34; Deposition of Kiess, p. 14). In the same way that females have held jobs in the trades and craft group, Gregg Kiess, defendant's manager of administrative services, held an office and clerical position from August, 1978 through January 1, 1979. (Deposition of Kiess, p. 8). Barry Hively was also employed in the office and clerical group. (Deposition of Stocker, p. 119). Presently, all the office and clerical em-

ployees are females. Thus, while the jobs in the trades and crafts group and office and clerical group have been held predominantly by males and females, respectively, they have not been so held exclusively.

The trades and crafts group has not been restricted to men. The defendant has not discouraged the plaintiffs from seeking trades and crafts jobs. (Deposition of Raypole, pp. 19–20; Deposition of Rosenberger, pp. 20–21; Deposition of Targarrt, pp. 23–28; Deposition of Dalton, pp. 5, 16; Deposition of Gawthrop, pp. 7, 13, 22; Deposition of Gregory, pp. 26–28; Deposition of Kelly, p. 14; Deposition of Puckett, pp. 27, 30, 35). Most of the plaintiffs have no interest in trades and crafts jobs. (Deposition of Dalton, pp. 15, 16; Deposition of Gregory, p. 26; Deposition of Kelly, p. 14; Deposition of Puckett, pp. 27, 30, 35; Deposition of Raypole, pp. 19, 34–36; Deposition of Rosenberger, pp. 20–27; Deposition of Targarrt, p. 28).

Some of the plaintiffs, however, have sought to be a part of the trades and craft group. Plaintiff Marian Gregory was not allowed to have her job in the office and clerical group reclassified to the trades and craft group. (Deposition of Gregory, pp. 23–25). Plaintiff Diane Gawthrop voluntarily left the trades and crafts group and then tried to have her job reclassified as a trades and crafts job.[1] (Deposition of Gawthrop, pp. 26–28). Elaine Beard worked as a switchboard operator in the trades and crafts area until the switchboard itself was moved to the office and clerical area. After moving the switchboard to the office and clerical area Beard was included in the office and clerical group.

### B.

*Differences Between the Office and Clerical Group and the Trades and Craft Group*

As noted above, employees in the office and clerical group have predominantly been

---

1. The plaintiffs have argued that the defendant kept the trades and crafts group and the office and clerical group segregated by sex. To support this argument plaintiffs allege that the defendant, through Elmer Stocker, classified the jobs performed by females as office and clerical. Plaintiffs also argue that the defendant

reclassified certain jobs to keep both groups segregated. The deposition testimony of Gregory, Gawthrop, and Beard does not show that the defendant kept the two groups segregated, or raise genuine issues of material fact on that issue.

females, while employees in the trades and crafts group have predominantly been males. The defendant, however, has not restricted the trades and crafts group to men or discouraged any of the plaintiffs from seeking jobs in the trades and crafts group. Besides the make-up of the two groups there are other differences between the groups.

Trades and crafts jobs have traditionally been higher paying than officer and clerical jobs. The jobs, however, are not similar.[2] (Deposition of Beard, pp. 48–49; Deposition of Gawthrop, p. 30; Deposition of Kelly, p. 18; Deposition of Targarrt, p. 28). Many trades and crafts jobs require employees to work outside in close proximity to high voltage power lines and other safety hazards. The linemen positions require a four year apprenticeship. (Deposition of Phil Fry, pp. 5–7). Office and clerical employees work indoors, face no safety hazards, and are not required to go through an apprenticeship. (Deposition of Beard, p. 49; Deposition of Puckett, pp. 35–36). While the jobs are dissimilar in these respects, not all of the jobs are entirely dissimilar. The night dispatcher's job, a trades and craft job, for example, has some similarity to the day dispatcher's job, an office and clerical job. (Deposition of Stocker, pp. 111–114). Nevertheless, nearly all of the office and clerical jobs are entirely dissimilar from the trades and crafts jobs.

## C.

### Wage and Benefit Negotiations Generally

The office and clerical group and the trades and crafts group have separate wage and benefit negotiations with management each year. Each group has its own representatives. Those representatives meet annually with defendant's general manager to discuss wages and benefits. These meetings are held separately

and they take place in the fall. Then, around November, the defendant's board of directors approves the final budget for the following year.

To prepare for these annual wage and benefit negotiations the defendant uses various wage surveys. (Deposition of Stocker, pp. 80–86). These surveys are used to determine what employees with similar jobs were being paid around the State of Indiana. These surveys include the Indiana Statewide REMC survey, the Indiana-Purdue Fort Wayne survey for the City of Fort Wayne, and the Indiana and Michigan Electric Company survey.

There have been differences in the wages and benefits obtained by these two groups over the years. The differences in the benefits results from three things: (1) the separate collective bargaining format; (2) the differences in the functions and responsibilities in the two groups; and (3) the differences in employee preferences in the two groups. (Deposition of Stocker, pp. 62–63, 145–146). In some years the trades and crafts group negotiated larger percentage wage increases than the office and clerical group. In other years the office and clerical group negotiated larger wage increases. (Deposition of Stocker, pp. 23–40).[3]

## D.

### 1984 Wage and Benefit Negotiations for 1985

During the 1984 wage and benefit negotiations the defendant was represented by Elmer Stocker. As general manager, Stocker had overall responsibility for the defendant's daily operations. Stocker reported to the defendant's board of directors.

During the 1984 negotiations Stocker became aware of an imbalance in wages paid to office and clerical employees and wages

**2.** At oral argument plaintiffs' counsel conceded that the office and clerical jobs are dissimilar, except for low secretarial positions.

**3.** Plaintiffs' allegation that a practice developed whereby each group received substantially the same total (wages and benefits) annual percent-

age increase (Plaintiffs' Reply Brief, p. 3) is not supported by citation to the record. It is more accurate to say that the amount of the total increase for either group was subject to change on an annual basis, depending on the surveys, the negotiations, and such things as the cost of living. (Deposition of Stocker, pp. 39–44).

paid to trades and craft employees. (Deposition of Puckett, pp. 17–19; Deposition of Kiess, pp. 25–26). Compared to other employees in the electric industry the trades and craft group was underpaid and the office and clerical group was overpaid. (Deposition of Stocker, pp. 70–80, 80–82; Deposition of Heffelfinger, p. 11; Deposition of Schrader, pp. 17–26; Deposition of Fry, pp. 30–33). In making this determination Stocker relied upon various wage surveys, including the Indiana statewide survey.[4] (Deposition of Stocker, pp. 80–86). During the negotiating process Stocker met with the board of directors and made his determinations known.[5]

Relying on Stocker's determination, the board authorized Stocker to give the office and clerical group a wage increase of zero to six percent. (Deposition of Heffelfinger, pp. 9–10; Deposition of Schrader, p. 17). In a meeting with office and clerical representatives Elaine Beard and Colleen Puckett, Stocker said that the office and clerical group would get a "big fat red zero" for their 1985 wage increase.[6] (Deposition of Beard, pp. 11–12; Deposition of Puckett, pp. 17–19). The office and clerical group had demanded a raise equal to that received by the trades and craft group. In telling the office and clerical group representatives that they would not be getting a wage increase Stocker indicated that according to wage surveys the office and clerical group employees were overpaid. (Deposition of Puckett, pp. 17–19). The office and clerical employees ultimately received no wage and benefit increase in

1985. The trades and crafts group received a total increase of six percent.

## E.

### Defendant's Employment Policies

Defendant's employment policy manual encourages self-improvement through formal education. Educational fees are paid by the defendant. The plaintiffs have taken courses and attended various seminars selected by them. None of the plaintiffs have taken any seminars to help train or qualify them for positions in the trades and crafts group. Defendant's policy also states that employees should be compensated fairly and comparably with others who have comparable skills in the electric industry.

The office and clerical group working agreement contains a grievance procedure. Under this procedure employees may grieve disputes by submitting them to an immediate supervisor. The initial decision may then be appealed to the general manager, board of directors, and ultimately to final and binding arbitration. None of the plaintiffs have filed grievances claiming a denial of the right to work in the trades and crafts group. None of the plaintiffs have ever filed a grievance claiming discrimination in wages, benefits, or working conditions.

## III.

### Legal Claims Under Title VII

Plaintiffs are relying on both disparate impact and disparate treatment theories.

---

**4.** At one point the plaintiffs take the position that Stocker relied exclusively on the statewide survey. (Plaintiffs' Reply Brief, p. 44). At another point the plaintiffs take the position that Stocker used various wage surveys but relied primarily upon the statewide survey. (Plaintiffs' Reply Brief, pp. 22–23). There is no genuine issue of material fact on this point. The record shows that Stocker relied upon a number of surveys, including the statewide survey. (Deposition of Stocker, pp. 80–86).

**5.** On page 24 of their Reply Brief, the plaintiffs concede that Stocker made his determination of the pay imbalance known to the board. (*See also* Deposition of Stocker, pp. 74–75). Plaintiffs, however, point to some immaterial factual disputes as to how Stocker made the determina-

tion known. Board member Bruce Heffelfinger testified in his deposition that Stocker did not present the averages by job classification, but by job group. (Deposition of Heffelfinger, pp. 12–14). Board member Schrader, on the other hand, testified that Stocker presented the averages by job categories and titles. (Deposition of Schrader, pp. 21–26). There are also factual disputes regarding the means of the presentation. None of these disputes create genuine issues of material fact. It is undisputed that Stocker relied on various wage surveys and made his reliance known to the board.

**6.** While the defendant does not believe that Stocker used this language, the defendant willingly concedes, for the purpose of this motion, that this language was used.

The parties agree that both theories may be relied upon. *See, e.g., Atonio v. Wards Cove Packing*, 810 F.2d 1477 (9th Cir.1987) (en banc). The analytical framework for these two theories is distinct. For that reason, the court will examine each theory separately.

## A.
### Disparate Impact

The disparate impact theory is derived from § 703(a)(2) of Title VII, 42 U.S.C. § 2000e–2(a)(2) (1982). That section provides that:

(a) It shall be an unlawful employment practice for an employer—

\* \* \* \* \* \*

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

A disparate impact claim, simply stated, challenges "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *International Bro. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977).

The method of proving a disparate impact claim is well settled. To prove a prima facie case of disparate impact a plaintiff must show that a facially neutral employment practice has an adverse impact on a protected group, such as women. *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1126 (7th Cir.1987); *Shidaker v. Carlin*, 782 F.2d 746, 749–50 (7th Cir.1986). In establishing a prima facie case a plaintiff must prove more than an inference of discriminatory impact, he must prove the discriminatory impact at issue. *Spaulding v. University of Washington*, 740 F.2d 686, 705 (9th Cir.1984), cert. denied, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984); *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 482 (9th Cir.1983). Proof of an employer's intent to discriminate, however, is not required in disparate impact cases. *Am. Fed. of S., C., & Mun. Emp. v. State of Washington*, 770 F.2d 1401, 1405 (9th Cir.1985) (quoting *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854–55 n. 15).

If the plaintiff proves a prima facie case the burden of persuasion shifts to the employer, who must prove the job relatedness or business necessity of the practice. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). If the employer carries the burden of showing that the neutral employment practice is job related, the plaintiff may the show that the practice is a mere pretext for discrimination. *Bunch v. Bullard*, 795 F.2d 384, 393 (5th Cir.1986).

### i.
### Policy or Practice

Defendant claims that it is entitled to summary judgment because the plaintiffs have not identified an employment policy or practice for disparate impact purposes and cannot, therefore, establish a prima facie case. The plaintiffs assert that the "defendant adopted a facially [neutral] policy when it determined that members of the trades and crafts [group] would receive increases but that members of [the] office and clerical [group] would not." Plaintiffs claim that "this policy benefitted male employees while operating to the detriment of female employees."

For Title VII disparate impact purposes, simply labelling an employer's action a "policy" or "practice" is not sufficient. *Spaulding*, 740 F.2d at 708. The substance of the employer's actions is what determines whether there is a policy or practice. *Id.* It is necessary for the plaintiff to identify a facially neutral employment practice so that the defendant can respond by offering proof of job relatedness or business necessity. *Pouncy v. Prudential Ins. Co. of America*, 668 F.2d 795, 801 (5th Cir.1982).

The plaintiffs' alleged policy or practice is somewhat vague. The plaintiffs

claim that the defendant adopted a policy "... when it determined that members of [the] trades and crafts [group] would receive increases but that members of [the] office and clerical [group] would not." As noted in the facts, the defendant's board of directors gave Stocker authority to determine whether the office and clerical group would receive an increase in wages. Relying on various wage surveys which showed that the office and clerical group was overpaid and the trades and crafts group was underpaid, the defendant, through Stocker, ultimately decided to give the trades and craft group a total increase of six percent in 1985. Thus, the plaintiffs are alleging that when the defendant, relying on wage surveys, determined to give the office and clerical group no increase in wages and benefits, while giving the trades and crafts group a total increase of six percent, it established a policy or practice for adverse impact purposes.[7]

The court rejects this argument and holds that this case is not proper for adverse impact analysis. First, the decision not to give the office and clerical group a wage increase in 1985 was a single decision; it was not a policy or practice. The plaintiffs cannot simply attack the unfavorable impact of any decision made by the defendant. *Atonio, supra* (Marshall, J., concurring in part, dissenting in part) (citing *Spaulding*, 740 F.2d at 707). Rather, the plaintiffs must establish a policy or practice. *Pouncy*, 668 F.2d at 800, 801. That the decision not to give the office and clerical group a wage increase in 1985 was made in reliance on wage surveys does not establish a policy or practice.[8] The defendant's single decision not to give the plaintiffs a wage or benefit increase in 1985 is simply not a policy or practice for disparate impact purposes.

There is a second reason why the defendant's decision not to give the plaintiffs a wage increase does not constitute a policy or practice. An employer's reliance on the market to set its wages is "not the sort of 'policy' at which disparate impact analysis is aimed." *Spaulding*, 740 F.2d 686, 708.[9] As noted in *Spaulding*, every employer constrained by market forces must consider market values in setting labor costs. *Id.* Employers dealing with the market are "price-takers." In setting wages according to market forces, employers are not following a "policy" in any meaningful sense. *Id.* When the defendant made the decision not to give the office and clerical group a wage increase in 1985 it was not following a policy, it was adjusting wages in accordance with market forces.

Holding that an employer's reliance on market forces to set wages constitutes a facially neutral employment practice would thoroughly confuse the disparate impact analytical framework. As noted earlier, when a plaintiff establishes a prima facie case, the defendant must then show job-relatedness or business necessity. *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854. This would not be possible in any meaningful sense if an employer's reliance on market forces is labelled a policy or practice. Reliance on the market is inherently job relat-

---

**7.** The plaintiffs have not argued that the defendant's reliance on wage surveys historically, constitutes a policy or practice. Such an argument would fail. The evidence shows that in some years the office and clerical group received larger percentage wage increases than the trades and crafts group. The defendant's historical reliance on wage surveys, therefore, has not had an adverse impact on the plaintiffs. To establish a prima facie case, the plaintiffs must prove the discriminatory impact at issue. *Moore*, 708 F.2d at 482.

**8.** If the defendant's reliance on wage surveys during the 1984 negotiations qualified as a policy or practice, without reference to its historical reliance on wage surveys, then either the trades and crafts group or the office and clerical group

would be able to establish a prima facie case of disparate impact every time one group or the other received an unequal wage increase. This would require the defendant either to give equal wage increases each year, or to prove job relatedness or business necessity.

**9.** The plaintiffs attack the application of *Spaulding* in this case, implying that it only rejected the use of the disparate impact model in broad-ranging sex-based wage discrimination claims based on comparable worth. While *Spaulding* held that disparate impact could not be applied to a comparable worth claim, it went on to hold that reliance on the market to set wages is not a facially neutral policy for disparate impact purposes. *See Spaulding*, 740 F.2d at 708, 709.

ed and is a built-in form of business judgment. *Spaulding,* 740 F.2d at 708. Beyond asserting the inherent "business necessity" automatically built in to an employer's reliance on the market, the defendant cannot meaningfully respond. The disparate impact model is thus inappropriate in this case.[10]

The court has not been able to find any cases where a disparate impact analysis has been applied to challenge an employer's decision to set wage rates, made in reliance on wage surveys. The facially neutral employment policies to which a disparate impact analysis has been applied include, among others: intelligence testing (*Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)); height or weight requirements (*Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977)); leave requirement upon pregnancy (*Harriss v. Pan American World Airways, Inc.,* 649 F.2d 670 (9th Cir.1980)); excluding applicants based on arrest records (*Gregory v. Litton Systems, Inc.,* 472 F.2d 631 (9th Cir.1972)); sex segregated benefit plans (*Wambheim v. J.C. Penney Co.,* 705 F.2d 1492 (9th Cir.1983)); and in-house employee selection plans (*Shidaker v. Carlin,* 782 F.2d 746 (7th Cir. 1986)). All of these cases, unlike the case at bar, involve identifiable policies which an employee can respond to by offering proof of job relatedness or business necessity.

The reason that it is not proper to require an employer to show job relatedness or business necessity in a wage increase case was recently articulated by one legal scholar:

The practice of paying market rates is an impermissible focus for a disparate impact claim, not because it is too broad but because it is a manifestation of, and

fully consistent with the nation's basic economic policy: that goods and services are to be produced through the functioning of product and labor markets. This market-oriented policy has existed and continues to exist despite its obviously different impacts on societal groups. Therefore, paying market rates is beyond challenge under a disparate impact claim unless Congress decides otherwise.

Fogel, *International Sex—Based Pay Discrimination: Can It Be Proven?,* Lab.Law Journal p. 291, 298 (May, 1986). This commentator's views are entirely consistent with the court's analysis of case law and the disparate impact model of proof. Plaintiffs' disparate impact theory cannot go forward.

ii.

*Subjective Employment Decisions*

The defendant strenuously argues that the decision not to give the office and clerical workers a wage and benefit increase in 1985 was a subjective decision to which the disparate impact analysis should not be applied. Since the court has already decided that the plaintiffs' disparate impact claims cannot go forward this argument does not merit thorough analysis. The court notes, nevertheless, that the subjective element of the defendant's decision not to give the plaintiffs a wage and benefit increase further supports the court's decision that the plaintiffs' disparate impact claims cannot go forward.

■ *Atonio v. Wards Cove Packing,* 810 F.2d 1477 (9th Cir.1987) (en banc), is the most recent discussion of this issue.[11] In *Atonio,* the court resolved a conflict in the Ninth Circuit, and held that "subjective employment practices may be challenged under a disparate treatment analysis."

10. This second reason for not applying the disparate impact theory to this case applies only to the wage disparity and not the benefit disparity. As the plaintiffs note, the court in *Wambheim v. J.C. Penney, Inc., infra,* applied the disparate impact analysis to a discrepancy in benefits. More recently, the Seventh Circuit, in *Colby v. J.C. Penney, supra,* applied the disparate impact analysis in a case involving fringe benefits. Both *Colby* and *Wambheim,* however, involved well established policies. Both employers had adopted "head of household" policies. In this

case, as noted earlier, the defendant has adopted no "policy" or "practice" for disparate impact purposes. For that reason, plaintiffs cannot establish a prima facie disparate impact case with respect to the claim that the office and clerical group did not receive equal benefits in 1985.

11. The significance of many of the cases cited by the defendant, such as *Heagney v. University of Washington,* 642 F.2d 1157 (9th Cir.1981), are affected by this holding.

The court noted that the Second, Third, Sixth, Tenth, Eleventh, and District of Columbia Circuits apply disparate impact analysis to subjective practices and criteria while the Fourth Circuit does not. *Id.* The Fifth, Seventh, and Eighth Circuits have reached conflicting results. *Id.* This court is bound, by the doctrine of *stare decisis,* to follow the decisions of the Seventh Circuit, unless powerfully convinced that it would overrule itself. *Olson v. Paine, Webber, Jackson & Curtis, Inc.,* 806 F.2d 731 (7th Cir.1986).

■■■ In *Griffin v. Board of Regents of Regency University,* 795 F.2d 1281, 1288 n. 14 (7th Cir.1986), the court noted that "a disparate impact claim is more problematic when subjective factors are present in the decision-making process." In this case, Stocker was given the authority to give the office and clerical group an increase of zero to six percent. His analysis of the wage surveys, and the ultimate decision not to increase the wages of the office and clerical employees in 1985 was somewhat subjective, making any application of the disparate impact theory problematic.[12] For this additional reason, defendant is entitled to summary judgment on plaintiffs' claims, which rely on the disparate impact theory.

The defendant's decision not to give the office and clerical employees a wage or benefit increase in 1985 does not constitute a policy or practice. Moreover, employer wage decisions such as the decision in this case are not susceptible to disparate impact analysis. For these reasons the plaintiffs' claims, insofar as they are based on the disparate impact theory of discrimination, cannot go forward and the defendant is entitled to summary judgment on the disparate impact theory.

### B.

#### Disparate Treatment

■■■ The disparate treatment theory is derived from § 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1) (1982). That section provides that:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

A disparate treatment claim, unlike a disparate impact claim, requires proof of intent. *Reeder-Baker v. Lincoln Nat. Corp.,* 649 F.Supp. 647, 653 (N.D.Ind.1986). The parties agree that this case is governed by *Washington v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

■■■ In *Gunther,* the Supreme Court held that a plaintiff may state a claim of sex-based compensation discrimination under Title VII without proving that he or she is performing a job *substantially equal* to that held by a member of the opposite sex. *Gunther,* however, does not set forth the elements of a prima facie case of Title VII sex-based compensation discrimination. *Gunther,* 452 U.S. at 166 n. 8, 101 S.Ct. at 2246 n. 8. Indeed, as the dissenter points out, the majority repeatedly emphasized that the plaintiffs were not asking the court to compare the value of dissimilar jobs. *Id.* 101 S.Ct. at 2246, 2253–54.

In this case, the plaintiffs are asking this court to compare entirely dissimilar jobs. The trades and crafts employees work outside as linemen and groundmen. They face continual risks not faced by the office and clerical employees. Many of the trades and crafts employees undergo training not required by the office and clerical employees. Some of the plaintiffs in this case testified in their depositions that they were not qualified to perform trades and crafts jobs. In their brief, the plaintiffs state

12. In *Griffin,* the plaintiffs were employees of Regency University. The court noted that plaintiffs claim that a dual classification system had a disparate impact on women might not be appropriate for disparate analysis because hiring decisions involve many subjective factors. *Griffin,* 795 F.2d at 1288. As noted earlier, Stocker's decision not to give the office and clerical group a wage and benefit increase was based on the separate collective bargaining format, the differences in function between the two groups, the differences in employee preferences, and market forces.

that it is an "... undisputed fact in the record that secretaries do not perform the same job functions as linemen." (Plaintiffs' Brief, p. 37). The record clearly establishes the fact that trades and crafts jobs and office and clerical jobs are dissimilar.

The defendant argues that because the jobs held by the plaintiffs as office and clerical employees are not similar to the jobs held by the trades and craft employees, the plaintiffs are unable to state a prima facie case. The plaintiffs, relying primarily on *Gunther*, contend that a prima facie case can be stated despite the undisputed fact that the jobs are dissimilar.

Numerous post-*Gunther* cases have held that while Title VII sex-based wage discrimination claims, unlike an Equal Pay Act claim, do not require a showing of equal work, they do require a showing that the jobs which are being compared are similar.[13] *See, e.g., Craik v. Minnesota State University Bd.*, 731 F.2d 465, 479 (8th Cir.1984) (defendants unlawfully paid women lower salaries than similarly situated men); *Epstein v. Secretary of U.S. Dept. of Treasury*, 739 F.2d 274, 278 (7th Cir.1984)[14] (noting district court's finding that "similarly situated" male was given an upgrade); *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1133–34 (5th Cir.1983); *Beall v. Curtis*, 603 F.Supp. 1563, 1581 (M.D.Ga. 1984) (similar in skill, effort, and responsibility); *Sparrow v. Piedmont Health Systems Agency, Inc.*, 593 F.Supp. 1107 (M.D.N.C.1984); *Briggs v. City of Madison*, 536 F.Supp. 435 (W.D.Wis.1982) (similar in skill, effort, and responsibility). *See also* Annotation, *Wage Differentials as Violative of Those Provisions of Title VII of the Civil Rights Act of 1984, as Amended, (42 U.S.C. § 2000e, et seq.), Which Prohibit Sex Discrimination in Employment*, 62 A.L.R.Fed. 33 (1983).

The message of these cases is that a plaintiff cannot, under the *McDonnell Douglas-Burdine* paradigm, establish a prima facie case of wage discrimination under Title VII by comparing himself or herself to another person that is not similarly situated. While the cases all recognize *Gunther*'s holding (that Title VII does not demand a showing of equal work), they require some degree of similarity. The reasoning for requiring some degree of similarity was succinctly expressed by one court:

> Although other factors may enter into the compensation determination, it is the factor of skill, effort, responsibility and working conditions of the wage rate. [Footnote omitted]. By eliminating these factors in their prima facie case as an explanation for a differential in wage rates plaintiffs have eliminated the most common defense to a pay discrimination case brought pursuant to Title VII. [Footnote omitted].

*Briggs*, 536 F.Supp. at 445–46. This court fully agrees with the reasoning in the *Briggs* decision. The most obvious and common reason to pay one employee more or less than another is that they are not performing similar jobs. Dissimilar jobs cannot be compared for the purpose of establishing a prima facie case.

 The court recognizes that this holding makes the first step in the *McDonnell Douglas-Burdine* paradigm, the step of establishing a prima facie case, a more

---

**13.** A number of pre-*Gunther* cases required plaintiffs to show that they performed equal work. Some pre-*Gunther* cases, however, set forth requirements analogous to those set forth in the post-*Gunther* cases. *See, e.g., Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 785–86 (7th Cir.1979) (in finding prima facie case court noted that plaintiff performed work of substantially the same skill, effort and responsibility); *Christensen v. State of Iowa*, 563 F.2d 353, 356 (8th Cir.1977).

**14.** In both *Jennings v. Tinley Park Community*, 796 F.2d 962, 965 (7th Cir.1986) and *Boyd v. Madison County Mutual Insurance Co.*, 653 F.2d 1173 (7th Cir.1981), *cert. denied*, 454 U.S. 1146, 102 S.Ct. 1008, 71 L.Ed.2d 299 (1982), the Seventh Circuit touched on the issue of establishing a prima facie case in sex-based discrimination compensation cases brought under Title VII. Without setting forth the elements of a prima facie case, the court in *Boyd*, concluded that the plaintiffs had established a prima facie case, but went on to hold that the defendant had articulated a non-discriminatory reason which was not shown to be pretextual. Relying on *Boyd*, the court in *Jennings*, also concluded, with some reservation, that the plaintiffs had established a prima facie case. Neither case discussed the issues at stake in this case, however.

difficult one.[15] Establishing a prima facie case should not be onerous. Proof of a prima facie case merely entitles the plaintiff only to an inference of discrimination and is not a factual finding to that effect. *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 512 (7th Cir.1986). On the other hand, establishing a prima facie case entitles the plaintiff to an inference of discrimination and requires the employer to offer some legitimate non-discriminatory explanation, which then ultimately moves the court to the issue of pretext and questions of motive and intent. When, as in this case, the plaintiffs' jobs are entirely dissimilar from those which they are being compared to, the court will not infer discrimination. To do so would essentially entitle any protected group to an inference of discrimination merely because that group was compensated unequally.[16]

 The defendant, assuming *arguendo* that the plaintiffs have established a prima facie case, argues that there is a legitimate non-discriminatory reason for giving the trades and crafts employees a wage and benefit increase in 1985, while freezing the wages and benefits of the office and clerical group: wage surveys showed that the trades and craft group was underpaid and the office and clerical group overpaid. Defendant goes on to argue that the plaintiffs have not provided proof of pretext sufficient to withstand summary judgment. *See Foster v. Arcata Associates*, 772 F.2d 1453 (9th Cir.1985). The court agrees that the defendant has articulated a legitimate non-discriminatory reason which the plaintiffs cannot show is pretextual. As the court's statement of material facts makes clear, the defendant froze the wages and benefits of the office and clerical group, while giving the trade and craft group a total increase of six percent, because the surveys showed that the office and clerical group was overpaid and the trades and craft group was underpaid.[17] Thus, assuming *arguendo* that a prima facie case has been shown, the defendant has explained its actions. There is no issue for trial.

A district court may grant summary judgment when a plaintiff fails to make out a prima facie case. Indeed, one of the purposes of the burdens of proof and production in Title VII cases "is to help district courts identify meritless suits and to stop them short of full trial...." *Steckl v. Motorola, Inc.*, 703 F.2d 392, 394 (9th Cir. 1983). Viewed in the plaintiffs' favor, *Anderson*, 106 S.Ct. at 2511, the material facts show that the plaintiffs seek to establish a prima facie case by comparing themselves to a group with entirely dissimilar responsibilities and functions. If establishing a prima facie case means anything at all in a Title VII sex-based wage compensation case, the plaintiffs' jobs must be similar in some respect to the group who alleg-

15. The plaintiffs argue that job similarity is important only in comparable worth cases and that the defendant is confusing the prima facie stage of this case with comparable worth principles. In arguing that entirely dissimilar jobs cannot be compared for the purpose of establishing a prima facie case under the disparate treatment theory, the defendant is not confusing this case with comparable worth principles. Rather, the defendant is arguing that it is improper to infer discrimination when the jobs which are being compared are dissimilar.

16. This point was carefully considered by the Supreme Court in *Gunther*. The employer feared that allowing Title VII claims to proceed (where plaintiffs received unequal pay for work that was not equal) would subject the pay structure of every employer to the scrutiny of the federal courts because any type of comparison could be drawn. The Court explained that the employer's fears were unjustified because the plaintiffs sought to prove by *direct evidence* that their jobs were worth 95 percent as the male guards, but that they were only receiving 70 percent as much pay. *Gunther*, 452 U.S. at 181, 101 S.Ct. at 2253. In other words, the plaintiffs held jobs not entirely dissimilar from those held by the male guards, to whom they compared themselves. *Accord Plemer*, 713 F.2d at 1133. In this case there is no direct evidence of discrimination, nor are the jobs held by the office and clerical employees similar to those held by the trades and craft employees. They are entirely dissimilar.

17. The plaintiffs, as the court's factual statement shows, have not shown that there is a genuine issue of material fact in this case regarding the defendant's intent. A Title VII disparate treatment claim cannot succeed without a showing of intent. *Reeder-Baker*, 649 F.Supp. at 653. As the Supreme Court has stated, "[this case] is so one-sided that [the defendant] must prevail as a matter of law." *Anderson*, 106 S.Ct. at 2512.

edly received favorable treatment because of their sex.

## CONCLUSION

There are no genuine issues of material fact which preclude summary judgment. The plaintiffs may not employ the disparate impact theory in this case. The plaintiffs have failed to establish a prima facie case under the disparate treatment theory. Accordingly, the defendant is entitled to summary judgment.

