Elaine K. BEARD, Jacquelyn Dalton, Diane Gawthrop, Marian Gregory, Melinda Kelly, Colleen A. Puckett, Patricia Raypole, Janice E. Rosenberger, and Donna J. Targgart, Plaintiffs–Appellants,

v.

WHITLEY COUNTY REMC, Defendant–Appellee.

No. 87–1620.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1987.

Decided Jan. 27, 1988.

David B. Keller, Baker & Daniels & Shoaff, Ft. Wayne, Ind., for plaintiffs-appellants.

Wayne O Adams, III, David J. Carr, Bingham, Summers, Welsh & Spilman, Indianapolis, Ind., for defendant-appellee.

Before WOOD, COFFEY, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The appellants, employees of the appellee, alleged sex discrimination by the appellee based on one year's wage and benefits negotiations. These negotiations resulted in the appellants' receiving no annual increase in their wages, while other employees of the appellee did receive increases. The district court, after reviewing all the evidence on the record, concluded that there was no genuine issue of material fact. It therefore granted the appellee's motion for summary judgment. Because we agree that the appellants have failed to present a genuine issue of material fact, we affirm the judgment of the district court.

# I

## Background

### A. *Procedural Posture*

The appellants commenced this case by filing discrimination charges with the Equal Employment Opportunity Commission (EEOC) in May and June of 1985. The EEOC found no reasonable cause to credit the discrimination allegations. It issued a notice of right to sue and the appellants then brought this action in the United States District Court for the Northern District of Indiana. The appellee, Whitley County REMC (now Northeastern REMC) (the REMC), filed an answer in which it raised the defense that the complaint failed to state a claim upon which relief can be granted.

On November 20, 1986, the REMC filed a motion for summary judgment. In its motion, the REMC alleged that there was no genuine issue of material fact presented by the appellants with respect to their contention that the REMC unlawfully discriminated against them on the basis of their sex. The district court granted the REMC's motion for summary judgment in an order dated March 19, 1987. The appellants then filed a timely notice of appeal. Jurisdiction in the district court is based on 42 U.S.C. § 2000e–5(f)(3). Jurisdiction in this court is based on 28 U.S.C. § 1291.

### B. *Facts*

The hourly work force at the REMC consists of two groups, the trades and crafts group (T & C) and the office and clerical group (O & C). These two groups predominantly, although not exclusively, are composed of male and female workers respectively. All appellants are members of the O & C group.

"[N]early all of the office and clerical jobs are entirely dissimilar from the trades and crafts jobs." *Beard v. Whitley County REMC*, 656 F.Supp. 1461, 1466 (N.D.Ind. 1987). The type of work performed is different. The T & C group jobs primarily involve repair, maintenance or operation of the REMC's high voltage electrical lines and any related equipment and facilities. The O & C workers primarily perform secretarial and clerical tasks. The conditions under which the work is performed are also different. Many of the T & C group jobs require the employees to work outside and in close proximity to high voltage power lines and other safety hazards. In contrast, the O & C group employees work indoors and face no safety hazards. The REMC management, as well as the employees themselves, have referred to both the T & C group and the O & C group by different names. Sometimes, the T & C group was referred to as the "guys group," while the O & C group was referred to as the "girls group." One deposition also indicates that the T & C employees sometimes were called the "outside people," while the O & C group was referred to as the "inside people."

Historically, the two work forces have negotiated their own "group-wide" agreements concerning wage and benefits increases. *Id.* In preparation for these annual wage and benefits negotiations, the REMC relied on various wage surveys. The management of the REMC used these sur-

veys to discern the compensation level of employees with similar jobs throughout the State of Indiana. These surveys included the Indiana state-wide REMC survey, the Indiana–Purdue–Fort Wayne survey for the city of Fort Wayne, the survey of wages paid by the Indiana and Michigan Electric Company, and possibly the National Rural Electric Cooperative Association, National Compensation Survey.

Traditionally, the separate negotiations of the two work forces have produced different wage and benefits packages. According to the district court, these differences primarily have been a product of three factors: "(1) the separate collective bargaining format; (2) the differences in the functions and responsibilities of the two groups; and (3) the differences in employee preferences in the two groups. In some years, the T & C group negotiated larger percentage wage increases than the O & C group. In other years, the O & C group negotiated larger wage increases." *Id.* (citation omitted).

In preparation for the negotiations concerning the 1985 wage increases, the REMC's general manager, Elmer Stocker, obtained wage surveys for the various T & C and O & C job classifications. *Id.* at 1467. These surveys evidenced an imbalance in the wages being paid to the T & C and O & C employees. Compared to other employees in the municipal electric industry, the REMC was underpaying the T & C group and overpaying the O & C group. Mr. Stocker then notified the REMC board of directors of the wage imbalance. Relying on Mr. Stocker's analysis, the board of directors authorized him to grant the O & C group a wage increase of 0 to 6%.

During the negotiations for the 1985 wage and benefits package, Mr. Stocker allegedly stated to O & C representatives Elaine Beard and Colleen Puckett that the

O & C group would get "a big, fat, red zero" for their 1985 wage increase. Mr. Stocker also stated that the O & C group would not be getting a wage increase because of the wage survey's indication that the employees were overpaid. The REMC negotiated a total package increase of 6% for the T & C group. The O & C group had demanded a raise equal to that received by the T & C group. Ultimately, however, the REMC granted the O & C group no wage or benefits increase for 1985.

## II
## District Court Opinion

The district court held that there were no genuine issues of material fact to bar the REMC's motion for summary judgment. In reaching its holding, the court analyzed the appellants' case separately under two theories: disparate impact and disparate treatment.

In dismissing the disparate impact claim, the district court first noted that the plaintiffs had failed to identify "a facially neutral employment practice so that the defendant can respond by offering proof of job relatedness or business necessity." *Id.* at 1468 (citing *Pouncy v. Prudential Ins. Co. of America*, 668 F.2d 795, 801 (5th Cir.1982)). Rather, held the court, the decision not to give a wage increase to the O & C group "was a single decision; it was not a policy or practice." *Id.* at 1469. The court also noted that Mr. Stocker's decision was based on the various wage surveys conducted in the industry. The court concluded that the REMC's reliance on the market to set its wage rates "is 'not the sort of "policy" at which disparate impact analysis is aimed.'" *Id.* [1]

The district court then considered the appellants' disparate treatment claim. The court began by noting that the employees

---

1. The district court quoted the Ninth Circuit's opinion in *Spaulding v. University of Wash.*, 740 F.2d 686, 708 (9th Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984), *overruled, Antonio v. Wards Cove Packing Co.*, 810 F.2d 1477 (1987) (en banc). In addressing the defendant's argument that the wage and benefits decision was a subjective decision to which

the disparate impact analysis should not be applied, the district court relied on this court's decision in *Griffin v. Board of Regents*, 795 F.2d 1281, 1288, n. 14 (7th Cir.1986), in ruling that disparate impact theories generally are inappropriate when employment decisions involve numerous subjective factors, as the court found present here. *Beard*, 656 F.Supp. at 1470–71.

in the T & C group and the employees in the O & C group have entirely dissimilar jobs. *Id.* at 1471. The court then acknowledged that, in *Washington County v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), "the Supreme Court held that a plaintiff may state a claim of sex-based compensation discrimination under Title VII without proving that he or she is performing a job *substantially equal* to that held by a member of the opposite sex." *Beard*, 656 F.Supp. at 1471 (emphasis in original). Yet, continued the district court, while the plaintiffs need not show that the jobs under comparison are substantially equal, they must show that the jobs do have "some degree of similarity." *Id.* at 1472. Similarity was important, said the district court, in order to permit the employer to attempt to rebut the prima facie case by "offer[ing] some legitimate non-discriminatory explanation." *Id.* at 1473. As a result, the court ruled that the appellants had not made out a prima facie case. *Id.* The district court went on to articulate a second rationale for granting the REMC summary judgment on the disparate treatment claim. The district court reasoned that, assuming arguendo a prima facie case, the REMC presented a legitimate, nondiscriminatory reason for giving the T & C group, and not the O & C group, a raise in 1985. The court found that the REMC's purpose—to correct an imbalance in the respective salaries o the T & C and O & C groups, as evidenced by the various wage surveys—was a valid justification. *Id.* Moreover, it found that this justification was not a pretext. Therefore, the district court granted the REMC's motion for summary judgment. *Id.* at 1474.

### III

### Discussion

#### A. *Disparate Impact*

##### 1.

A disparate impact claim challenges "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

Although the district court extensively addressed a disparate impact analysis, the REMC contends that such a claim is not properly before us on appeal. With respect to the 1985 wage freeze, although the disparate impact issue appears to have been raised in the district court, it is not before us. The issue was not raised by the appellants in their principal brief. Moreover, in their reply brief, the appellants flatly state "it is clear that the issue of the applicability of disparate impact analysis is not before the court in connection with the freezing of the women's wages." Appellants' Reply Br. at 1.

With respect to the 1985 benefits issue, specifically the two groups' respective insurance plans, it is also far from clear that the issue has been properly raised. While the appellants did raise the issue before the district court, the only reference to disparate impact that they raise before this court is brief mention of the court's decision in *Colby v. J.C. Penney Co.*, 811 F.2d 1119 (7th Cir.1987). Appellants' Br. at 26. Yet, the appellants never expressly mention a disparate impact claim. Rather, they merely assert that the REMC's insurance coverage policy "is similar to the 'explicitly sex based rule' described in *Colby* under which Penney had formerly permitted only 'male employees to obtain coverage for their spouses under the company's medical and dental plans.' [*Colby,*] 811 F.2d 1119, 1121." Appellants' Br. at 26–27.

Rule 28(a)(4) of the Federal Rules of Appellate Procedure mandates that an appellant must present in its brief the issues to the appellate court that the appellant desires to litigate. In addition, the issues must be supported by appropriate judicial authority. *Id.; see Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220 (7th Cir. 1986); *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 933, 93 L.Ed.2d 984 (1987). "It is not the obligation of this court to research and construct the legal arguments open to

parties, especially when they are represented by counsel." *Sanchez,* 792 F.2d at 703.

### 2.

 Even if we assume that this minimal discussion sufficiently raises a disparate impact claim with respect to insurance benefits, the appellants have failed to present a prima facie case. The Supreme Court set forth the appropriate standard in *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). In *Dothard,* the Court held "that to establish a prima facie case of [disparate impact] discrimination, a plaintiff need only show that the facially neutral standards in question [result] . . . in a significantly discriminatory pattern." *Id.* at 329, 97 S.Ct. at 2726–27. "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The appellants apparently contend that the REMC's "practice" of granting the T & C group more favorable family insurance benefits than the O & C group establishes a prima facie case. The REMC counters that "the record shows that the only 'policy' was to allow T & C and O & C to negotiate whatever combination of benefits and wages they wished." Appellee's Br. at 13. We believe that the appellee's submission is correct. On this record, it is undisputed that the differences in insurance benefits were a product of the separate negotiation processes. Furthermore, on this record, there is no reasonable basis for a claim that the division of the workforce into two groups for purposes of compensation-benefits negotiations was an employer-imposed policy or practice. Because there is no evidence of a facially neutral practice that produces a significantly discriminatory pattern, the appellants' claim—to the extent it is based on a disparate impact theory—must fail.

### B. *Disparate Treatment*
#### 1.

In *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court described the basic allocation of burdens and order of proof in a Title VII case alleging discriminatory treatment:

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.,* at 802, 93 S.Ct. at 1824. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.,* at 804, 93 S.Ct. at 1825.

The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. . . . The *McDonnell Douglas* division of intermediate evidentiary burdens serves to bring the litigants and the court expeditiously and fairly to this ultimate question.

*Id.* 450 U.S. at 252–53, 101 S.Ct. at 1093–94 (footnote omitted) (citations omitted).

#### 2.

In this case, we must apply this Title VII disparate treatment methodology in the context of a summary judgment. A motion for summary judgment should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a grant of summary judgment, we must view the record and all inferences drawn therefrom

in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Illinois v. Bowen,* 808 F.2d 571, 574 (7th Cir.1986). However, when confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party must do more than simply "show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). "The court should neither 'look the other way' to ignore genuine issues of material fact, nor 'strain to find' material fact issues where there are none...." *Secretary of Labor v. Lauritzen,* 835 F.2d 1529, 1534 (7th Cir.1987) (quoting *Mintz v. Mathers Fund, Inc.,* 463 F.2d 495, 498 (7th Cir. 1972)).

When the issue is one of intent, we approach the application of these principles with special caution. *See Powers v. Dole,* 782 F.2d 689, 694 (7th Cir.1986). However, the basic allocation of responsibility among the parties remains the same and "even when such issues of motive or intent are at stake, summary judgment is proper 'where the plaintiff presents no indication of motive or intent supportive of his position.'" *Id.* (quoting *Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985)).

**3.**

We first turn to the matter of a prima facie case. Although their brief is far from clear (the matter is mentioned in the statement of facts but not in the argument section), appellants appear to argue that three statements made by Mr. Stocker to various appellants show direct evidence of antifemale animus. These statements were: 1) that in reference to the 1985 wage increases "you girls are going to get a big, fat, red zero," Appellants' App. at 1, deposition of Patricia Raypole at 22; 2) that "he can go out on the street and pick up anybody off the street 'to come in and do you girls' jobs,'" *id.* at 12, deposition of Donna Targgart at 7; and 3) that "the girls must be making too much money, look at all the new cars in the parking lot," *id.* at 3, deposition of Patricia Raypole at 24.

We do not believe that these statements, whether evaluated separately or in combination, raise, on this record, anything more than the "metaphysical doubt" that, under the holding of *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356, is insufficient to create a genuine issue of material fact. Inappropriate remarks, standing alone, need not raise an inference of discriminatory intent. *See Clark v. Santa Fe R.R. Co.,* 731 F.2d 698, 702 (10th Cir.1984) (employer's discriminatory intent was not inferred from discriminatory remarks made to employee by employee's supervisor because there was no "particularly egregious treatment"). *See generally Nazaire v. Trans World Airlines, Inc.,* 807 F.2d 1372, 1380 (7th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1979, 95 L.Ed.2d 819 (1987); *Torres v. County of Oakland,* 758 F.2d 147, 152 (6th Cir.1985); *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982). These statements, while more confrontational than what one might expect in the normal day-to-day atmosphere of the workplace, occurred during a period of wage negotiations. Most importantly, the use of the inappropriate appellation "girls," according to this record, was in conformity with a general usage that the appellants, by their own admission, reenforced by their own use of the term. Under these circumstances, we can hardly characterize these episodes as "outcome determinative under the governing law." *Lauritzen,* at 1534

(quoting *Hossman v. Spradlin,* 812 F.2d 1019, 1020–21 (7th Cir.1987) (per curiam) (quoting *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.) (en banc), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983))). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and ... it should be interpreted in a way that allows it to accomplish this purpose." *Celotex,* 106 S.Ct. at 2553.

With respect to the existence of a prima facie case, we must deal with another problem. The appellants also contend that a prima facie case of compensation discrimination is established merely if a plaintiff shows "that members of one gender [have] be[en] treated differently than the other." Appellants' Br. at 23. The appellants base this standard on a distillation of *Washington County v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), our opinions in *Jennings v. Tinley Park Community,* 796 F.2d 962 (7th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987), and *Boyd v. Madison County Mut. Ins. Co.,* 653 F.2d 1173 (7th Cir.1981), *cert. denied,* 454 U.S. 1146, 102 S.Ct. 1008, 71 L.Ed.2d 299 (1982), as well as "so many other discrimination cases." Appellants' Br. at 23. In *Gunther,* female prison guards brought an action against the county government. They alleged that they had been paid lower wages than male guards in the male section of the jail and that part of the differential was attributable to intentional sex discrimination; the county had set the pay scale for female guards, but not for male guards, at a level lower than that warranted by its own survey of other wage scales and of the worth of the job. The Supreme Court held that Title VII does not bar a sex discrimination claim based on differences in compensation merely because the jobs subject to comparison are not equal. However, the Court did not state explicitly the components of a prima facie case based on such a theory.

This unsettled issue has been presented to this circuit before. However, in the absence of further guidance from the Supreme Court, we have not addressed squarely the matter because our disposition of the cases before us did not require resolution of the issue. We face the same situation here and therefore decline to pass definitively on this issue. As in *Jennings,* 796 F.2d at 965 n. 2, we shall, for the remainder of this discussion, assume, without holding, "that to establish a prima facie case plaintiffs need only show a difference in treatment between two major groups of employees of different sex...." *See also Boyd,* 653 F.2d at 1178 (affirming district court's determination that prima facie case existed without formulating standard).

4.

■ If we assume, arguendo, that the appellants have established a prima facie case, the burden shifts to the employer to show a valid, nondiscriminatory reason for the difference in treatment. The district court held that the REMC's stated reliance on wage surveys was a sufficient justification for any resultant disparate treatment. *Beard,* 656 F.Supp. at 1473. We agree that the employer has submitted sufficient evidence to establish that the wage differential between the two groups was the product of a valid, nondiscriminatory business reason. The wage surveys were an appropriate demonstration by the REMC that its negotiating position was the product of a business decision to maintain a compensation-benefits package comparable with that offered to similar workers in the geographic area.

5.

If the employer meets its burden, then the employee still can present evidence establishing that the employer's justification merely is a pretext for discrimination. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Wislocki–Goin v. Mears,* 831 F.2d 1374, 1379 (7th Cir.1987). We have held previously that pretext in this context means "pretext for discrimination." *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 559 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). It must be established that the REMC relied upon the wage survey ratio-

nale to hide the truth that it intended to discriminate against the appellants based on sex. It is insufficient merely to show that the REMC erroneously relied on one wage survey as opposed to another, or that it exercised poor business acumen. *See id.* The appellants attempt to show such pretext for discrimination by pointing to discrepancies among the board members and employees of the REMC concerning the identity of the wage surveys relied upon in the negotiations.

■ We believe that the district court correctly concluded that there was no evidence upon which a finding of pretext could have been based. The record only shows that various deponents recalled differently minor details of the wage surveys. Showing that memories differ as to exactly what was scribed on a blackboard[2] or whether a certain chart was highlighted and distributed[3] two years after the fact does not create a *genuine* issue of fact as to whether the REMC's reliance on the wage surveys was a pretext. This evidence raises—at best—the "metaphysical doubt" that *Matsushita* teaches is insufficient to avoid summary judgment.[4] The appellants, who bear the burden of proof, have hardly presented the sort of specific factual allegation that raises a genuine issue for trial. *See Celotex,* 106 S.Ct. at 2553 (1986); *Anderson,* 106 S.Ct. at 2510

(1986); *see also Lauritzen,* at 1534; *Hossman,* 812 F.2d at 1020–21; *Phillips,* 710 F.2d at 296.

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the district court granting the REMC's motion for summary judgment.

AFFIRMED.

2. The record evidences that there was disagreement concerning whether Mr. Stocker averaged the wage surveys for the REMC on a blackboard as a "group" or by "job classification" during the board meeting that discussed management's strategy for the 1985 wage and benefits negotiations. R. 53, deposition of Bruce Heffelfinger at 12; deposition of Douglas Schrader at 21.

3. The record evidences that there was some confusion over whether the board received a highlighted wage survey during the 1985 board meeting. R. 53, deposition of Paul Fry at 32–33; deposition of Bruce Heffelfinger at 12; deposition of Douglas Schrader at 21; deposition of Elmer Stocker at 85–86, 95.

4. In addition, the appellants contend that a discrepancy between Mr. Stocker's recollections and the board's recollections over who authorized the zero percent wage and benefits increase for 1985 indicates pretext. However, the record indicates only that Mr. Stocker "believed" that the board *initiated* the *discussions* of a zero percent increase. R. 53, deposition of Elmer Stocker at 73. The district court proper-

ly found as a fact that the board ultimately authorized Mr. Stocker to grant the O & C group a zero to six percent increase. *Beard,* 656 F.Supp. at 1467; *see* R. 53, deposition of Bruce Heffelfinger at 9–10; deposition of Douglas Schrader at 17.

The appellants also contend that Paul Fry, the Chairman of the REMC board, said to Greg Kiess, a supervisor, "[w]hen that judge finds out we had the money in the budget, he will give them [appellants] $50,000.00." R. 53, affidavit of Colleen Puckett at 1. Mr. Fry denied ever having said the alleged statement. R. 53, deposition of Paul Fry at 42–43. The appellants never argue, nor attempt to show that this statement evidenced a discriminatory intent on the part of either Elmer Stocker or the REMC.

Finally, the appellants allege in passing that the REMC approached wage adjustments on a group basis, rather than on an individual basis. Appellants' Br. at 28. They fail, however, to demonstrate how this fact, if established, shows antifemale bias.